UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                       ) | No. 25-CR-10207-IT |
| ) | |
| ERIC SPOFFORD,           ) | |
|        Defendant ) | |

**MOTION TO DISMISS
ONE OBJECT OF COUNT 1 AND ENTIRETY OF COUNT 2
WITH INCORPORATED MEMORANDUM OF LAW**

Now comes the Defendant, Eric Spofford, by and through undersigned counsel, and hereby moves the Court for an order dismissing Count 2, charging a violation of 18 U.S.C. §2261A(2)(B), and so much of Count 1 that charges conspiracy to violate §2261A(2)(B). As grounds and reasons therefore, Mr. Spofford respectfully submits that §2261A(2)(B), properly construed, criminalizes the "use" of "facilities of interstate commerce" only when that "use" is "at the crux of what makes the underlying offense criminal," *Dubin v. United States*, 599 U.S. 110, 114 (2023)—*i.e.*, when the facility of interstate commerce (phone or computer) is actually utilized as a means to stalk, harass or intimidate, not simply when an individual uses the internet or a cellular telephone in a manner entirely ancillary to the prohibited stalking, harassing or intimidation.

In *Dubin*, in construing the aggravated identity theft statute, codified at 18 U.S.C. §1028A(a)(1), the Supreme Court confronted Congress' deployment of the term "use" in a similar format. The aggravated identity theft statute provides that anyone who, "during and in relation to any felony violation . . . knowingly . . . uses, without lawful authority, a means of

1

identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." Rejecting the government's push for a broad reading, the Court held that §1028A(a)(1) is violated only "when the defendant's misuse of another person's means of identification is at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature of a billing method." *Dubin*, 599 U.S. at 114. In so doing, the Court held that "[t]he text and context of the statute" did not support the government's "boundless interpretation." *Id.* at 114.

The same holds true here. 18 U.S.C. §2261A(2)(B) criminalizes the "use[] . . . [of] any . . . facility of interstate . . . commerce to engage in a course of conduct that . . . causes or attempts to cause, or would be reasonably expected to cause substantial emotional distress to" the victim. Designated by Congress and federal courts as a prohibition on "cyberstalking," this statutory provision must be construed to reach only that "use" of a facility of interstate commerce which is "at the crux" of the stalking, harassing and/or intimidation. In other words, the statute was intended to reach, and only reaches, an individual who uses the "facility" of interstate commerce to engage in the stalking, harassing or intimidation—*i.e.*, tweets, emails, texts, chats, and/or calls *directed at the victim*. To hold otherwise would mean that §2261A(2)(B) applies to any and all instances of stalking where any participant utilizes the internet or a cellphone, no matter how tangentially related to the underlying criminal conduct. Under such a construction, the federal government will have free reign to prosecute virtually any conceivable stalking offense, resulting in a significant infringement upon states' enforcement authority, contrary to Congressional intent. *See* 146 Cong. Rec. S10211-01, at S10219 (Oct. 11, 2000) (statement of Senator Abraham) ("Some jurisdictions are doing an outstanding job in

cracking down on this kind of conduct . . . This legislation will not supplant their efforts . . . where the criminal is deliberately using the means of interstate commerce to place his or her victim in reasonable fear of serious bodily injury, my bill will allow the Federal Government to prosecute that person.").

Here, the "crux" of the charged offense is throwing bricks through windows and spray-painting offensive messages on homes, quintessential state stalking offenses with no meaningful nexus to any commerce facility. Indeed, there is not a single allegation that any facility of interstate commerce was actually used to stalk, harass or intimidate a single victim. Instead, Mr. Spofford stands charged with violating §2261A(2)(B) because his alleged co-conspirators ostensibly used the internet to search for relevant home addresses and/or used their cellular phones to communicate with each other—not the alleged victims—before and after the alleged acts of vandalism. Consistent with Supreme Court and First Circuit precedent, this "use" of the internet and cellphone is not enough. To satisfy the charging statute, a facility of interstate commerce (such as the internet or a cellphone) must be at the "crux of the criminality," rather than merely "ancillary." The present Indictment fails to satisfy that standard.

As further grounds and reasons therefore, Mr. Spofford relies upon the memorandum of law incorporated herein.

**REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1(d), Mr. Spofford respectfully requests oral argument.

**COMPLIANCE WITH LOCAL RULE 7.1(a)(2)**

The government, by and through Assistant U.S. Attorney Jason Casey, advises it will oppose this motion.

**MEMORANDUM OF LAW**

**I.   Background.**[1]

Mr. Spofford stands charged with one count of conspiracy to commit stalking through interstate travel and using a facility of interstate commerce, in violation of 18 U.S.C. §2261A(1)(B) and (2)(B) ("Count 1"); one count of stalking using a facility of interstate commerce and aiding and abetting same, in violation of 18 U.S.C. §2261A(2)(B) ("Count 2"); and two counts of stalking through interstate travel and aiding and abetting same, in violation of 18 U.S.C. §2261A(1)(B), one occurring on May 20, 2022 ("Count 3"), and the second occurring on May 20 and 21, 2022 ("Count 4"). *See generally* Dkt. 1.

The Indictment alleges that, after New Hampshire Public Radio published an article regarding alleged misconduct by Mr. Spofford during his tenure as Chief Executive Officer of Granite Recovery Centers, a drug and alcohol treatment company, Mr. Spofford "devised a scheme to harass and terrorize Victim 1," the author of the article, "Victim 1's immediate family members [Victims 2 and 3], and Victim 4," the editor of the article, "by vandalizing their homes at night with large rocks and bricks and by spray painting the homes with lewd and threatening language." Dkt. 1 ¶ 11.

At an "in-person meeting on or about April 21, 2022, [Mr. Spofford allegedly] provided" Eric Labarge "with the addresses of Victims 2, 3, and 4, and what [Mr. Spofford] believed was Victim 1's address but, in fact, was the address of Victims 5 and 6," who had moved into that address after Victim 1. *Id.* ¶¶ 2, 15(a). Labarge relayed this information to an "acquaintance[]"

---

[1] The below facts are taken from the Indictment and accepted as true only for the purposes of this pleading.

4

of Labarge's, Tucker Cockerline. *Id.* ¶ 3. On April 22, Cockerline "used Google to search for the addresses of Victims 5 and 6 in Hanover, New Hampshire." *Id.* ¶ 15(d). Shortly thereafter, he "used Google to search for and navigate to the address of Victims 5 and 6." *Id.* ¶ 15(e). Cockerline returned to the address on April 24 and "threw a brick through an exterior window of the home . . . , and wrote the word 'C**T' in red spray paint on the front of the home." *Id.* ¶ 15(g).

On April 22, 2022, another "acquaintance[]" of Labarge's, Keenan Saniatan, "used Google to search for the address of Victims 2 and 3 in Hampstead, New Hampshire." *Id.* ¶¶ 3, 15(l). Saniatan thereafter "used Google to search for Victim 4's address in Concord, New Hampshire." *Id.* ¶ 15(m). Saniatan "used Google" to search for Victims 2 and 3's address again on April 23. *See id.* ¶ 15(n). On April 24, Saniatan "threw a large rock through an exterior window of the home of Victims 2 and 3 . . . , and wrote the word 'C**T' in red spray paint on the front door of the home." *Id.* ¶ 15(p). Saniatan did the same at Victim 4's home. *See id.* ¶ 15(r).

The above-described vandalism of the homes of Victims 5 and 6 (who again lived at an address previously inhabited by Victim 1) and Victims 2 and 3 appear to be included within Count 2, which charges that Mr. Spofford "use[d] an interactive computer service, electronic communication service, electronic communication system of interstate commerce, and other facilities of interstate commerce to engage in a course of conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to Victim 1 and Victim 1's immediate family members (*i.e.*, Victims 2 and 3)." *Id.* ¶ 19.

On an unknown date between May 1 and May 18, 2022, Mr. Spofford allegedly

"provided Labarge with the addresses of Victims 1, 2 and 3, along with specific instructions to vandalize the victims' homes at night with bricks and red spray paint." *Id.* ¶ 15(t). On May 20, "Cockerline drove from New Hampshire to Methuen, Massachusetts," where he "purchased two bricks that he intended to use to vandalize the homes of Victims 1, 2 and 3." *Id.* ¶¶ 15(aa) and 15(bb). Later that day, "Cockerline used Google to search for and navigate to the address of Victims 2 and 3 in Hampstead, New Hampshire." *Id.* ¶ 15(ff). Cockerline again "threw a brick at the exterior of the home . . . and wrote the" same offensive word "in red spray paint on the front of the home." *Id.* ¶ 15(hh). These alleged events appear to form the basis for Count 3, which charges that Mr. Spofford "traveled in interstate commerce from the Commonwealth of Massachusetts to Hampstead, New Hampshire with the intent to harass and intimidate another person, and in the course of and as a result of such travel, engaged in conduct that caused, attempted to cause, and would reasonably be expected to cause substantial emotional distress to Victim 1 and Victim 1's immediate family members (*i.e.*, Victims 2 and 3)." *Id.* ¶ 21.

That same day, May 20, Michael Waselchuck (who had been asked by Cockerline to participate) allegedly "traveled from New Hampshire to the vicinity of Victim 1's home in Melrose, Massachusetts." *Id.* ¶ 15(ii). "Waselchuck threw a brick through an exterior window . . . , and wrote the words 'JUST THE BEGINNING' in red spray paint on the front of the home." *Id.* ¶ 15(jj). These alleged events appear to be the basis for Count 4, which charges that Mr. Spofford "traveled in interstate commerce from the State of New Hampshire to Melrose, Massachusetts with the intent to harass and intimidate another person, and in the course of and as a result of such travel, engaged in conduct that caused, attempted to cause, and would reasonably be expected to cause emotional distress to Victim 1." *Id.* ¶ 23.

6

## II.     Legal Standard.

"An indictment is ripe for dismissal if the facts" alleged by the government "demonstrate that, as a matter of law, the prosecution will not be able to prove each of the elements of the charged offense." *United States v. Sidoo*, 468 F. Supp. 3d 428, 436 (D. Mass. 2020). Accordingly, a defendant may move to dismiss on the grounds that "the specific facts alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016) (citation omitted); *see also United States v. Enmons*, 410 U.S. 396, 412 (1973) (affirming dismissal of indictment where statute did not prohibit the conduct charged).

Such a challenge to the indictment is not precluded by mere general allegations setting forth the elements of the offense. While such general allegations are necessary, they are not sufficient to withstand a motion to dismiss, at least where the specific factual allegations set out in the charging document do not amount to a violation of the relevant statute. *See United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002) (rejecting government argument "that an indictment . . . charges an offense . . . as long as it recites in general terms the essential elements of the offense, even if the specific facts alleged in the charging instrument fail to satisfy those elements"), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358, 410 (2010); *United States v. Pirro*, 212 F.3d 86, 92-95 (2d Cir. 2000) (affirming dismissal of indictment where specific facts alleged did not satisfy all elements of charging statute). In *Panarella*, the information charged that the defendant "knowingly and willfully assisted" another to avoid apprehension for honest services wire fraud. 277 F.3d at 684. The defendant failed to "point to any specific statutory language that the charging instrument omitted" and, indeed, the document

7

"track[ed] the language of the relevant statutory provisions nearly word for word." *Id.* In assessing the validity of the defendant's guilty plea, however, the Third Circuit did not stop there. Instead, it proceeded to consider (but ultimately reject) the merits of the defendant's argument because "a charging document fails to state an offense if the specific facts alleged . . . fall beyond the scope of the relevant criminal statute." *Id.* at 685; *see also United States v. Nosal*, No. 08-CR-0237, 2010 WL 934257, at *2 (N.D. Cal. Jan. 6, 2010) ("General conclusory allegations need not be credited . . . when they are belied by more specific allegations in the [indictment]." (citation omitted) (alteration in original)), *aff'd*, 676 F.3d 854 (9th Cir. 2012). This analysis is part of the Court's "duty to review the Government's Indictment and confirm that a legally deficient charge does not go to the jury." *United States v. Pimenta*, No. 14-CR-649, 2015 WL 6502098, at *5 (D.N.J. Oct. 27, 2015) (dismissing charge because factual allegations failed to satisfy element of offense). "Indeed, it would be a waste of judicial resources to conduct a trial, only to rule on a post-trial motion that the government's theory of criminal liability fails, no matter what facts it was able to establish at trial." *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 n.5 (S.D.N.Y. 2012).

**III.  Argument.**

    A.  *Section 2261A(2)(B) does not reach the ancillary use of a facility of interstate commerce, but instead only reaches that use which is at the "crux" of the criminality—a reading that is consistent with Supreme Court precedent and the statute's legislative history.*

Section 2261A(2)(B) criminalizes the "use[] . . . [of] any . . . facility of interstate . . . commerce to engage in a course of conduct that . . . causes or attempts to cause, or would be reasonably expected to cause substantial emotional distress to" another. Here, the only references to possible uses of facilities of interstate commerce in the Indictment are (a) Labarge

8

and others involved in the vandalism (but notably not Mr. Spofford) allegedly using "Google" "to search for" and/or "navigate to" victims' addresses, *see* Dkt. 1 ¶¶ 15(d), (e), (l), (m), (n), (z), (ee), (ff); and (b) alleged use of cellphones by Labarge and others (but again not Mr. Spofford) to communicate before and after the vandalisms, *see id.* ¶¶ 15(b), (h), (i), (j), (u), (x), (y), (kk), (ll), (nn), (pp).  These facts, accepted as true only for purposes of this pleading, are insufficient to establish "use" of a facility of interstate commerce within the meaning of the charging statute.

As the Supreme Court and First Circuit have observed, the statutory "word 'use' poses some interpretational difficulties because of the different meanings attributable to it." *Dubin v. United States*, 599 U.S. 110, 118 (2023) (citation omitted); *see also, e.g.*, *United States v. Berroa*, 856 F.3d 141, 156 (1st Cir. 2017) (similar).  The "ordinary or natural meaning of 'use' is variously defined as [t]o convert to one's service, to employ, to avail oneself of, and to carry out a purpose or action by means of.  These various definitions . . . imply action and implementation.  Beyond that general concept, however, 'use' takes on different meanings depending on context," requiring examination of "the statute and the [surrounding] scheme to determine the meaning Congress intended." *Dubin*, 599 U.S. at 118 (citations omitted).

*Dubin* involved a prosecution under the aggravated identity theft statute, applicable "when a defendant, 'during and in relation to any [predicate offense], knowingly transfers, possesses, or ***uses***, without lawful authority, a means of identification of another person.'" *Id.* at 115 (quoting 18 U.S.C. §1028A(a)(1)) (emphasis added).  The defendant had "overbilled Medicaid for psychological testing," and the Fifth Circuit found that his conduct also constituted aggravated identity theft by reading the statute to apply to any fraudulent "billing or payment method" that "employs another person's name or identifying information." *Id.* at 113-14.  "This

9

type of prosecution [wa]s not uncommon." *Id.* at 115. The government had, prior to *Dubin*, "wielded §1028A(a)(1) well beyond ordinary understandings of identity theft." *Id.* at 116.

The Supreme Court reversed, holding that "[t]he text and context of the statute do not support such a boundless interpretation." *Id.* at 114. Instead, the Court held, "§1028A(a)(1) is violated when the defendant's misuse of another person's means of identification is at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature of a billing method." *Id.* at 114. In *Dubin*, "the crux of petitioner's overbilling was inflating the value of services actually provided, while the patient's means of identification was an ancillary part of the Medicaid billing process," such that the aggravated identity theft statute did not apply. *Id.*

*Dubin* observed at the outset that the case "turn[ed] on two of §1028A(a)(1)'s elements," including the statutory word "uses." *Id.* at 116. The government urged the Court to read this word "broadly and in isolation," such that the statute would "apply automatically any time a name or other means of identification happen[ed] to be part of the payment or billing method used in the commission of a long list of predicate offenses." *Id.* at 117. The defendant advocated for "a more targeted reading," requiring "a genuine nexus" between the means of identification and "the predicate offense." *Id.* (citation omitted). The Court observed, "[i]n deciding between the parties' readings, one limited and one near limitless, precedent and prudence require[d] a careful examination of §1028A(a)(1)'s text and structure." *Id.* at 118.

*Dubin* held that, while "uses," as well as the statutory phrase "in relation to," "are, in isolation, indeterminate, the statutory context, taken as a whole, point[ed] to a narrower reading." *Id.* at 118. In doing so, the Court made clear that "a statute's meaning does not always turn solely on the broadest imaginable definitions of its component words. . . . Even in cases where

the literal language of the statute is neutral in isolation, reading the whole phrase can point to a more targeted reading." *Id.* (citations omitted).

The Court found that the aggravated identity theft statute's "title and terms both point[ed] to a narrower reading, . . . centered around the ordinary understanding of identity theft," and "cut[] against the Government's broad reading, . . . bear[ing] little relationship to the common understanding of identity theft." *Id.*; *see also id.* at 122 (observing that the government's "broad reading" would "cover[] any time another person's means of identification is employed in a way that facilitates a crime"). Consulting dictionary definitions, *Dubin* concluded that "identity theft" entails "use of the means of identification" that "is at the crux of the underlying criminality." *Id.* at 122. The "definitions refer[red] to offenses built around what the defendant does with the means of identification in particular. In other words, the means of identification specifically is a key mover in the criminality. This central role played by the means of identification, which serves to designate a specific person's identity, explains why we say that the 'identity' itself has been stolen." *Id.* at 122-23. This observation "help[ed] explain why the examples resulting from the Government's theory d[id] not sound like identity theft. If a lawyer rounds up her hours from 2.9 to 3 and bills her client using his name, the name itself is not specifically a source of fraud; it only plays an ancillary role in the billing process." *Id.* at 123. "In other words, identity theft is committed when a defendant uses the means of identification itself to defraud or deceive." *Id.* "Use of the means of identification" must "be at the locus of [the criminal] undertaking, rather than merely passive, passing, or ancillary employment in a crime." *Id.* (citation omitted).

The present case warrants a similar result.

First, the statutory context supports a narrow reading, as in *Dubin*. While "use" of a "facility of interstate . . . commerce" could, in isolation, be read broadly, the remainder of the statutory language ("to engage in a course of conduct that . . . causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress") serves as a limitation, entailing a stronger connection between the facility of interstate commerce and the underlying stalking, harassing and/or intimidation that makes the defendant's conduct criminal. As in *Dubin*, the "facility of interstate commerce" must be the "key mover in the criminality." *Id.* at 123.

Second, legislative history and the ordinary meaning of "cyberstalking" support the same result. *See Berroa*, 856 F.3d at 156 (relying on legislative history in construing aggravated identity theft statute). Section 2261A was amended in 2000 to apply, for the first time, to a defendant who "uses the mail or any facility of interstate . . . commerce to engage in a course of conduct" prohibited by the statute. Congress expressly intended this language to "extend[] the interstate stalking prohibition to cover interstate 'cyber-stalking' that occurs by the use of the mail or any facility of interstate or foreign commerce, such as by telephone or by computer connected to the internet." H.R. Conf. Rep. 106-939, 105 (2000). As co-sponsor of the Senate version of the bill, Senator Spencer Abraham, explained:

> As the Internet, with all its positives, has fast become an integral part of our personal and professional lives, it is regrettable but unsurprising that criminals are becoming adept at using the Internet as well. Hence the relatively new crime of "cyberstalking," in which a person uses the Internet to engage in a course of conduct designed to terrorize another. Stalking someone in this way can be more attractive to the perpetrator than doing it in person, since cyberstalkers can take advantage of the ease of the Internet and their relative anonymity online to be even more brazen in their threatening behavior than they might be in person.

146 Cong. Rec. S10211-01, at S10219 (Oct. 11, 2000). In signing the bill, President Clinton

expressly stated, "[t]he Act creates an interstate cyberstalking offense."  Statement by the President on HR 3244, 2000 WL 1617225, at *2 (Oct. 30, 2000).  In the years since its enactment, courts have repeatedly and routinely referred to §2261A(2)(B) as a "cyberstalking" prohibition.  *United States v. Waithe*, 150 F.4th 16, 20 (1st Cir. 2025); *United States v. Leach*, 89 F.4th 189, 193 (1st Cir. 2023); *United States v. Cardozo*, 68 F.4th 725, 730 (1st Cir. 2023); *United States v. Sayer*, 916 F.3d 32, 34 (1st Cir. 2019); *United States v. Ackell*, 907 F.3d 67, 77 (1st Cir. 2018).

"Cyberstalking," consistent with the foregoing Congressional understanding, is customarily used to refer to stalking that occurs directly via the internet or other electronic means.  *See* Black's Law Dictionary (8th ed. 2004) (defining "cyberstalking" as "[t]he act of threatening, harassing, or annoying someone through multiple e-mail messages, as through the Internet . . . ."); Merriam-Webster, *available at* https://www.merriam-webster.com/legal/cyberstalking (last visited Nov. 14, 2025) (defining "cyberstalking" as "the use of electronic communication to harass or threaten someone with physical harm").

Given the foregoing, the defense respectfully submits the Court should construe §2261A(2)(B) to "capture" the foregoing "ordinary understanding of" cyberstalking, where "misuse of a" facility of interstate commerce "is at the crux of the criminality."  *Dubin*, 599 U.S. at 120.  The Court should, by contrast, reject the construction of the statute reflected in the Indictment, which "bears little relationship to the common understanding of" cyberstalking.  *Id.*

Indeed, opinions from this District and the First Circuit applying §2261A(2)(B), without exception, fit neatly within the ordinary meaning of cyberstalking.  *See, e.g.*, *Leach*, 89 F.4th at 192-93 (defendant recorded victims performing sexual acts in video calls, only to later contact

13

them via social media and threaten to reveal videos of the calls to the victims' friends and family members); *United States v. Cain*, 779 F. App'x 6, 8 (1st Cir. 2019) (defendant "stalked and harassed [victim] via telephone calls and text messages, some of which contained threats to injure [victim] and her immediate family members," eventually "calling, texting, or emailing her over 100 times per day" which included threats to "rape and murder" the victim and her family members); *Sayer*, 916 F.3d at 35 (defendant posted videos of victim "engaged in sexual acts on various pornography websites detailing her name and current . . . address," created "a fraudulent Facebook account [and a similar Myspace account] including sexually explicit pictures of her," and "created numerous fake profiles on Yahoo! Messenger" that defendant used to pose as the victim and encourage men in online chats "to visit [her] at her home" (citation omitted)); *United States v. Cardozo*, No. 18-CR-10251, 2019 WL 2603096, at *1 (D. Mass. 2019) (Burroughs, J.) (defendant "used various platforms including Facebook, Twitter and the 'comment' sections of" an online magazine "and the website of Jane Doe 1 to engage in a cyberstalking and interstate threats campaign").

      Under the foregoing standard, the government's allegations here clearly do not suffice. In short, what the Indictment alleges is worlds away from any ordinary understanding of "cyberstalking." There is no allegation that Mr. Spofford, or anyone else involved in the alleged conspiracy, used social media, the internet, a cellphone, or any other conceivable facility of interstate commerce as a direct means of harassing anyone. Indeed, there is not a single allegation that any facility of interstate commerce was used to communicate with any alleged victim—not a single instance. Rather, the Indictment merely alleges that conspirators (lawfully) used Google to find the victims' addresses and communicated with cellphones before and after

the vandalisms. Such use of facilities of interstate commerce is a decidedly "ancillary feature" of the alleged criminal conduct, far from "the crux of the criminality." *Dubin*, 599 U.S. at 131-32. Count 2's mere conclusory assertion that the requisite use of a facility of interstate commerce occurred does not save the facial insufficiency of the underlying facts alleged. *See supra* pages 7-8.[2]

  B. *A narrow construction of the statute is consistent with Supreme Court precedent and avoids significant infringement upon states' enforcement authority.*

Finally, to the extent there is any ambiguity regarding the scope of §2261A(2)(B), it must be construed in Mr. Spofford's favor. The Supreme Court has "'traditionally exercised restraint in assessing the reach of a federal criminal statute.' This restraint arises 'both out of deference to the prerogatives of Congress and out of concern that a fair warning should be given to the world in language that the common world will understan[d] of what the law intends to do if a certain line is passed.' After all, '[c]rimes are supposed to be defined by the legislature, not by clever prosecutors riffing on equivocal language.'" *Dubin*, 599 U.S. at 129-30 (citations omitted). "Time and again, [the Supreme] Court has prudently avoided reading incongruous breadth into opaque language in criminal statutes." *Id.* at 130.

The "far-reaching" nature of the government's theory of prosecution here should give the Court pause. *Id.* (citation omitted). If §2261A(2)(B) applies to any and all instances of stalking

---

[2] Mr. Spofford notes that the Ninth Circuit declined to apply *Dubin* to §2261A. *See United States v. Diaz*, No. 23-1341, 2025 WL 275117, at *2 (9th Cir. Jan. 23, 2025) (unpublished). The Ninth Circuit did not include any explicit rationale for rejecting the argument, other than noting that *Dubin* involved a different statute. *See id.* ("The particular circumstances of the aggravated identity theft statute are not remotely present here."). For all of the reasons detailed herein, Mr. Spofford respectfully submits that *Diaz*, an unpublished, non-precedential decision, is not persuasive authority.

where any participant utilizes the internet or a cellphone, no matter how tangentially related to the underlying criminal conduct, the federal government will have free reign to prosecute virtually any conceivable stalking offense. This would result in a significant infringement upon states' enforcement authority, contrary to Congressional intent. *See* 146 Cong. Rec. S10211-01, at S10219 (statement of Senator Abraham) ("Some jurisdictions are doing an outstanding job in cracking down on this kind of conduct. . . . This legislation will not supplant their efforts. It will, however, address cases that it is difficult for a single State to pursue on its own, those where the criminal is stalking a victim in another State. In such cases, where the criminal is deliberately using the means of interstate commerce to place his or her victim in reasonable fear of serious bodily injury, my bill will allow the Federal Government to prosecute that person."); *see also, e.g.*, *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."). A reading of §2261A(2)(B) broad enough to apply here would also render §2261A(1), prohibiting stalking through interstate travel, almost entirely superfluous, in contravention of a well-established canon of construction. *See, e.g.*, *Dubin*, 599 U.S. at 126. "[H]ad Congress intended to sweep so far, it would have spoken with more clarity than it did." *Id.* at 130 (citation omitted).

      Indeed, in *Dubin*, the Court rejected the government's broad interpretation of the term "uses," characterizing the government definition as "seem[ing] to just mean 'employs' in any sense." *Dubin*, 599 U.S at 117. The Court noted that the government definition would render §1028A(a)(1) applicable "automatically any time a name or other means of identification happens to be part of the payment or billing method used in the commission of a long list of

16

predicate offenses," or, "[i]n other words, virtually all of the time." *Id*. Here, the same result would be reached if §2261A(2)(B) is interpreted to mean any ancillary use of the internet or a cellular telephone. In today's society, it hard to conceive of a fact pattern where an individual engaged in a traditional state stalking offense would not have used some facility of interstate commerce as an ancillary feature. In other words, the statute would apply "virtually all of the time," *Dubin*, 599 U.S at 117, resulting in a serious infringement of the states' enforcement authority, contrary to Congressional intent.

Finally and independently, "the rule of lenity requires ambiguous criminal statutes to be interpreted in favor of the defendants subjected to them." *Berroa*, 856 F.3d at 157 n.8 (citation omitted).

**IV.    Conclusion.**

For the foregoing reasons, Mr. Spofford respectfully requests that the Court dismiss Count 2 and the second conspiratorial object in Count 1 of the Indictment in this matter.

<br>

Respectfully Submitted,
ERIC SPOFFORD
By His Attorney,

**/s/ Robert M. Goldstein**
Robert M. Goldstein, Esq.
Mass. Bar No. 630584
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated: December 5, 2025

**CERTIFICATE OF SERVICE**

      I, Robert M. Goldstein, hereby certify that on this date, December 5, 2025, a copy of the foregoing document has been served via the Electronic Court Filing system on all registered participants.

      **/s/ Robert M. Goldstein**
      Robert M. Goldstein, Esq.